E-FILED
Friday, 26 September, 2025  11:37:33 AM
Clerk, U.S. District Court, ILCD

IN THE
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

DEANDRE D. DANIELS,
    Petitioner,

v.                                   Case No. 3:25-cv-1026-JEH

CHANCE JONES, Warden,
    Respondent.

**Order and Opinion**

Before the Court are Petitioner Deandre D. Daniels' Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) and Motion for Stay and Abeyance (Doc. 2), Motion to Supplement (Doc. 14), and Respondent's Motion to Dismiss (Doc. 9). Petitioner is currently serving a 47-year prison sentence imposed by the Illinois Circuit Court for McLean County, Illinois for attempted murder, aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of a weapon by a felon. For the reasons below, the Court GRANTS Petitioner's Motion to Supplement (Doc. 14) and Respondent's Motion to Dismiss (Doc. 9), DISMISSES Petitioner's Petition (Doc. 1) as untimely, and DENIES Petitioner's Motion for Stay and Abeyance (Doc. 2).

1

**I**[1]

**A**

On November 5, 2012, Robert Jackson was shot in the leg and Marcus Winlow was shot in the back during an altercation between members of two rival rap groups, Money Over Bitches (M.O.B.) and Blackout Mafia (B.O.M.). Petitioner (a member of M.O.B.) was later charged with attempted murder of Jackson, aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of a weapon by a felon.

At trial, the State presented evidence that Jackson was shot in the leg and Winlow was shot in the back on November 5, 2012. Law enforcement testified that they received "extremely little cooperation" from eyewitnesses during their investigation. Nonetheless, two eyewitnesses placed Petitioner on the scene: Michelle Brown and Raymond Davis.

One officer testified that he arrived on the scene at 4:16 p.m. after responding to a call of a shooting on Orchard Road in Bloomington. *People v. Daniels*, 2023 IL App (4th) 220701-U, ¶ 13, *appeal denied*, 226 N.E.3d 26 (Ill. 2024). He observed Winlow lying on the ground and Michelle Brown (Winlow's mother) holding a bloody cloth against a gunshot wound on Winlow's body. *Id.* He also observed Jackson nearby and saw he appeared to have been shot in the left thigh. *Id.* Another officer at the scene, Bloomington police officer Michael Luedtke, testified that Jackson told him "he was just standing there" and did not know who had shot him. *Id.* ¶15.

---

[1] Unless otherwise noted, the facts are taken from the undisputed facts in Respondent's Motion to Dismiss (Doc. 9), which are consistent with the official records from Petitioner's state court proceedings attached to the response (Doc. 9-1–9-9). *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."). The factual determinations of the state court are presumed to be correct, unless a petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Officer Luedtke also testified that he interviewed Brown at the scene. *Id.* ¶16. Brown told Luedtke that she was walking out of her residence when she saw "a group of black males run up on [Winlow] and [Jackson]." *Id.* She identified the members of the group as "Pimp" (a nickname for Petitioner), Jake Williams, Kenny King, "S. Dot." (a nickname for Qunshawn Gardner), and "Play" (a nickname for Anton Smith). *Id.* Luedtke further remembered Brown telling Luedtke that she saw Petitioner shoot at Jackson five times with a black gun. *Id.*

Brown testified that she was Winlow's mother and lived next door to Winlow on Orchard Road. She testified that she was familiar with certain individuals from the neighborhood, including Petitioner. However, unlike her statements to Officer Luedtke, at trial Brown testified that she was in her residence when one of her other children came into the house and told her Winlow had been shot. *Id.* ¶19. When she went outside she saw Winlow on the ground, but she said she did not know who had shot him. *Id.*

Given Brown's testimony, the State presented Brown with the statements that she gave the police immediately after the shooting and to the grand jury. *Id.* ¶20. These statements included that she was present at the shooting and that she had identified Petitioner as the shooter. *Id.* However, Brown denied that she had made those statements, said she did not recall, and said that she had lied previously. *Id.*

The State also introduced an affidavit that Brown had written prior to trial stating that she wanted to "remove [her] statement as the witness in this case." *Id.* ¶20. The affidavit said that she had not seen "Jake Williams, [Petitioner], Qunshawn Gardner, Anton Smith, Kenneth King, or Raymond Davis at the crime scene" and that she wanted all charges dropped. *Id.* At the end of the affidavit, she specifically noted that she was not coerced into writing the affidavit and that

3

she "would like all the gentlemen upon release to be ordered to attend several churches and give their testimonies while they thank God for a second chance in life." *Id*.

Finally, the State played Brown's videotaped police interview from the day of the shooting. The state court summarized the interview:

> Brown told the police that prior to the shooting, she was walking on Orchard Road behind Winlow and Kaythiese Fitch, who both stopped to talk to Jackson. As the three were talking, a group of other men approached them. The other group included defendant, Williams, [Ounshawn] Gardner, [Kenneth] King, [Aaron] Smith, and approximately four other people. Fitch and Smith began fighting. Williams pulled out a gun and shot Winlow one time. Williams then ran off. Fitch and Jackson ran toward a nearby "gangway." [Petitioner] pulled out a gun and fired approximately four times in the direction Fitch and Jackson had run, shooting Jackson in the leg. However, Brown clarified that she did not actually see Jackson get shot. Gardner also had a gun and pointed it at Brown when she accidentally picked up Gardner's jacket. Brown stated further that Raymond Davis, who was also present, was carrying a gun and wearing dreadlocks.

*Id.* ¶ 22.

Jackson testified, but did not identify the shooter. Instead, he testified that he was walking by himself in a vacant lot on Orchard Road when he was shot, but he did not see who shot him. *Id.* ¶ 24

Davis testified for the prosecution and placed Petitioner at the scene. He testified that on the afternoon of November 5, 2012, he met with Petitioner and King, also M.O.B. members, to make music at King's Orchard Road apartment. At the apartment, Davis saw Winlow and Fitch (who were members of B.O.M.). Davis and Winlow got into a fight, and then Davis, King, and Petitioner walked to Petitioner's apartment. Gardner and Smith joined them, and the group decided to record music at a nearby studio. Davis, Petitioner, King, and Gardner

4

got in a van to return to King's apartment to retrieve King's phone. As the men walked from the van to the apartment, a group of men attacked them. Davis testified that he heard gunshots, and he, King, and Gardner ran back to the van., but Petitioner did not.

The parties stipulated that Petitioner had previously been convicted of a felony and that he was visited at jail by King, Gardner, and Smith prior to trial.

In defense, Petitioner presented the testimony of Brandi Guzoskis, who lived nearby the shooting and had called 911. Guzoskis testified that she heard "about five" gunshots and looked out of her apartment and saw several men walking away. She saw a man with dreadlocks shoot a gun twice. She then called 911 and the recording of that call was played for the jury.

A man working just off Orchard Road testified that he heard between six and eight gunshots. The gunshots came in two waves, with a pause between them.

Petitioner's girlfriend testified that Petitioner did not have dreadlocks at the time of the shooting and did not own a gun.

The jury found Petitioner guilty of the charges and the trial court sentenced him to an aggregate term of 47 years in prison.

Petitioner filed several post-trial motions, including a motion arguing that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that a gun recovered during its investigation was later connected to an unrelated shooting. The trial court denied Petitioner's motions.

## B

Petitioner filed an appeal. Among other arguments, Petitioner argued that the trial court erred in declining to ask potential jurors about their potential gang bias during *voir dire*. The Illinois Appellate Court affirmed Petitioner's convictions. *People v. Daniels*, 2016 IL App (4th) 140131. Petitioner filed a Petition

for Leave to Appeal (PLA), which the Illinois Supreme Court denied on November 23, 2016. *People v. Daniels,* 65 N.E.3d 843 (Ill. 2016).

C

Petitioner then filed a *pro se* postconviction petition in state court. Petitioner mailed the petition on July 30, 2017, and it was file stamped as received on August 2, 2017. The state court appointed counsel, and counsel filed an amended petition. As amended, Petitioner's postconviction petition argued that trial counsel was ineffective for (1) failing to investigate alibi witnesses Maurice Sutton, Tylon McAllister, and Rodney Lane, and (2) preventing Petitioner from testifying in his own defense. After the trial court dismissed the petition, the Illinois Appellate Court reversed and remanded for an evidentiary hearing on Petitioner's claims. *People v. Daniels*, 2020 IL App (4th).

At the evidentiary hearing, Davis testified that Petitioner was not present at the shooting. The State asked Davis whether he lied at Petitioner's trial, and Davis said, "It wasn't really a lie; I just I wasn't really sure at that time." *Daniels*, 2023 IL App (4th) 220701-U, ¶ 51. Davis also said that he did lie to detectives because he was trying to "use the [Petitioner] as an alibi." *Id*. Davis was impeached with multiple prior felonies, including obstruction of justice.

Petitioner's two proposed alibi witnesses also testified. Sutton and McAllister testified that on November 5, 2012, they met with the other members of M.O.B. at Petitioner's apartment. The group decided to go to a studio to record music and took two cars. Sutton and Petitioner were to ride in the car driven by McAllister and everyone else rode in a van driven by Rodney Lane, Petitioner's cousin. The group driven by Lane was going to stop by King's apartment to get his phone. Sutton, McAllister, and Petitioner waited at Petitioner's apartment while King the others went to King's apartment. During that time, Petitioner's girlfriend came home and began to argue with Petitioner. Consequently, Sutton

6

and McAllister left without Petitioner and went directly to the studio. Both men were impeached with multiple prior felony convictions.

Lane also testified that he drove a van to Petitioner's house on the day of the shooting. On the way he picked up King "something Dot" and "some Ski or something." *Id.* ¶61. (As mentioned above, testimony at trial established that Gardner went by the nickname "S Dot.") Petitioner was in his apartment waiting on his girlfriend to call. When Lane left Petitioner's apartment, he said people asked to be dropped off at various places that he could not recall. He claimed that he dropped the three people—King "something Dot" and "some Ski or something"—at Culver's. Lane said that Petitioner was not in the van.

Jamell Jamison testified he was an eyewitness to the shooting but had not come forward sooner because he hoped the situation would work itself out and he did not want to be involved with the courtroom. *Daniels*, 2023 IL App (4th) 220701-U, ¶ 46. Jamison said he saw a fight and a man with long hair was armed with a weapon. *Id.* He said Petitioner was not the man with the gun and Petitioner was not present for the altercation. *Id.*

Petitioner's trial counsel, John Prior, also testified as a state witness, addressing Petitioner's ineffective assistance of counsel claims. Prior testified regarding his investigation of the alibi defense and his conversations with Petitioner where they decided together not to pursue the alibi defense. *Id.* ¶¶66–74. Notably, "Prior believed [Petitioner] was present at the shooting based on a conversation he had with [Petitioner], during which [Petitioner] did not deny being at the shooting and gave a smirk or a smile that Prior interpreted as confirming [Petitioner's] presence at the shooting." *Id.* ¶71.

Prior also testified regarding his decision not to seek the testimony of Stephen Shenkel, a jailhouse informant who had worn a wire to surreptitiously record a conversation with Petitioner. *Id.* ¶75. "Shenkel recorded [Petitioner] (1)

saying that he was in his apartment's bathroom when everybody else left and (2) lamenting that Prior explained that his decision not to call Shenkel as a witness was to avoid additional problems for the defense." *Id.* Prior explained that the "additional problems" were that "Shenkel said that [Petitioner] had told him that they had threatened—it was probably Michelle Brown—and she wasn't going to show up." *Id.*

The trial court denied the postconviction petition, finding Prior's testimony to be credible, Sutton and McAllister's testimony to be merely conflicting with Brown's statement, Jamison and Davis to be subject to scrutiny and impeachment, and that Lane's testimony did not provide a complete alibi due to how close Petitioner's apartment was from the crime scene. *Id.* ¶78. The Illinois Appellate Court affirmed. The Illinois Supreme Court denied Petitioner's PLA on January 24, 2024.

## D

After filing this Petition, Petitioner filed a motion for leave to file a successive postconviction petition in state court, which has not yet been ruled on. That petition relies on three additional affidavits he acquired in April 2024. First, Shalayne K. Doss's affidavit states she was an eye witness to the shooting and recalls seeing a group of guys she was familiar with in her "neighborhood gathering to fight." (Doc. 13 at 36). She ran out of her apartment and, when she got outside, there was a shooting. *Id.* She saw one individual with dreadlocks who had a gun, but she did not know him. She helped the victim and called 911, but did not cooperate with the police because she was upset with them about an unrelated incident. *Id.* Doss states that she has never seen Petitioner before, but he was not the person with dreadlocks involved in the shooting. *Id.*

Second, King signed an affidavit stating he was a codefendant in the case and he chose to plead guilty to charges so he could avoid prison. (Doc. 13 at 37).

8

He states he "felt he was acting in self-defense while attempting to enter [his] apartment." *Id.* He "attest[s] with certainty that [Petitioner] was not the shooter because he was not in [their] company." *Id.* He further states he could not come forward at the time of trial "due to [his[ own legal complications." *Id.*

Third, an affidavit from Smith states Smith was also arrested for the shooting that occurred on November 5, 2012. (Doc. 13 at 38). He said Petitioner was not present when the incident took place. Smith states Petitioner stayed behind in the bathroom when they left Petitioner's apartment. Smith further states he told his own attorney had cautioned him against testifying in Petitioner's defense. *Id.*

Petitioner's motion to supplement (Doc. 14), reports that his Motion for Leave to File a Successive Post-Conviction Petition has been granted.

## C

Petitioner filed this federal Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) on January 24, 2025. He argues he is entitled to federal habeas relief because (1) the trial court erred in declining to ask potential jurors about their potential gang bias during *voir dire*, (2) trial counsel was ineffective for failing to call alibi witnesses, preventing Petitioner from testifying in his own defense, misinforming Petitioner of the mandatory minimum sentence during plea negotiations, and failing to investigate potential eyewitness Shalayne Doss, and (3) the State violated *Brady* by failing to disclose that a gun recovered during its investigation was later connected to an unrelated shooting. Petitioner conceded he had failed to raise two of his ineffective assistance of counsel claims and his *Brady* claim in his state court proceedings. Accordingly, Petitioner filed a motion to stay and hold these proceedings in abeyance (Doc. 2) while he seeks leave to file a successive postconviction petition in state court.

9

After being ordered to respond, Respondent filed this Motion to Dismiss (Doc. 9), arguing that Petitioner's Petition is inexcusably untimely and that his motion for a stay should be denied. Petitioner filed a response (Doc. 13). This Order now follows.

## II

## A

A one-year statute of limitations applies to federal habeas petitions challenging state court convictions. *See* 28 U.S.C. § 2244(d). The limitations period runs from the latest of—

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*See* 28 U.S.C. § 2244(d)(1). Under subsection (A), the relevant "judgment" is the date on which the conviction and sentence are final. *See Burton v. Stewart*, 549 U.S. 147, 156–57 (2007). However, the statute of limitations is tolled during the pendency of a properly filed application for state postconviction relief. *See* 28 U.S.C. § 2244(d)(2).

Petitioner's conviction became final on February 27, 2017, 90 days after his PLA was denied by the Illinois Supreme Court and the time to file a petition for a writ of certiorari with the United States Supreme Court expired. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). Accordingly, the one-year deadline began to run on that date. The limitations period ran for 152 days, until July 30, 2017, when it was tolled due to Petitioner's filing of his state postconviction petition.[2] *See* 28 U.S.C. § 2244(d)(2). Petitioner's postconviction proceedings concluded when the Illinois Supreme Court denied his PLA on January 24, 2024. At that point the limitations period began running again with 213 days remaining. To timely file his Petition, Petitioner needed to file it by August 24, 2024. However, he filed it roughly five months too late, on January 24, 2025.

Petitioner's grounds for relief are not timely under any other statutory provision either. Petitioner argues that the factual predicate for his claim that his counsel failed to investigate potential eyewitness Shalayne Doss could not have been discovered through the exercise of due diligence before his conviction became final and, thus, is timely under § 2244(d)(1)(D). However, the factual predicate for his claim is not the actual testimony that Shalayne Doss would give, but the facts that arguably could make it true that counsel should have investigated her prior to trial. That factual predicate had to exist by the time of trial, or there would be no basis for an ineffective assistance of counsel claim. Moreover, Petitioner does not allege any State-created impediment to filing nor any newly recognized and retroactive constitutional right. *See* 28 U.S.C. § 2244(d)(1)(B), (C). Accordingly, the Court finds that Petitioner's Petition is untimely.

**B**

---

[2] As Respondent notes, the July 30, 2017, date is the proper date to consider Petitioner's petition filed assuming the prisoner mailbox rule applies.

Nonetheless, Petitioner argues that his untimeliness should be excused because he is actually innocent of the offense. In some circumstances, untimeliness may be excused pursuant to the "actual-innocence gateway" as announced in *McQuiggin v. Perkins*, 569 U.S. 383 (2013). In *McQuiggin*, the Supreme Court held "that actual innocence, if proved, serves as a gateway through which a petitioner may pass" to excuse procedural bars, including untimeliness. 569 U.S. at 386. However, the standard is demanding and "tenable actual-innocence gateway pleas are rare." *Id*. Actual innocence refers to factual innocence, not merely legal insufficiency of evidence. *Bousley v. United States,* 523 U.S. 614, 624 (1998). To be credible, a petitioner must support his actual-innocence claim with "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). And, a petitioner must show that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329. "In applying this standard, [courts] must consider all the evidence, both old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted at trial." *Wilson v. Cromwell*, 69 F.4th 410, 422 (7th Cir. 2023). "When evaluating a claim of actual innocence, our role "is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* at 423 (quoting *House v. Bell*, 547 U.S. 512, 538 (2006). "In a procedural—or "gateway"—actual-innocence claim, the petitioner's new evidence need only establish sufficient doubt about his guilt to justify a conclusion that his sentence is a miscarriage of justice '*unless* his conviction was the product of a fair trial.'" *Jones v. Calloway*, 842 F.3d 454, 462 (7th Cir. 2016) (quoting *Schlup*, 513 U.S. at 317).

12

"To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). While rare, the Seventh Circuit did find that witness testimony was sufficient to make a showing of actual innocence in *Jones v. Calloway*, 842 F.3d 454 (7th Cir. 2016). In *Jones*, the Seventh Circuit agreed that a petitioner had made a sufficient showing where another man present at the murder scene provided credible testimony that he was the lone shooter. *Id.* at 463. His story had been consistent over time and was compelling: he had turned himself in for the crime, confessed to the shooting, and consistently said that he was the lone shooter. *Id.* The new testimony was also consistent with the physical evidence, whereas the prosecution witnesses' testimony often was in tension with the forensics. *Id.* at 462.

However, generally, providing alibi or conflicting eyewitness testimony is insufficient to meet the actual innocence gateway. The Seventh Circuit has reached this result in several cases comparable to this one: In *Wilson v. Cromwell*, 69 F.4th 410 (7th Cir. 2023), the petitioner offered testimony of an eyewitness who identified the shooter as not the petitioner and instead identified the shooter as a prosecution witness. 69 F.4th at 421–22. While the eyewitness testimony was deemed credible as the state appellate court had found that it was generally worthy of belief, it did not satisfy the *Schlup* standard. *Id.* The Seventh Circuit found that new testimony "just adds a new voice to a highly complex, and often inculpatory, evidentiary record." *Id.* at 422. Notably, two eyewitnesses "still unequivocally identified [the petitioner] as the gunman." *Id.*

Similarly, in *Blackmon v. Williams*, 823 F.3d 1088 (7th Cir. 2016), two eyewitnesses had identified the petitioner as one of the two shooters. 823 F.3d at

13

1094. To prove his actual innocence, the petitioner had presented two alibi witnesses and one witnesses that was at the scene and claimed the petitioner was not the shooter. *Id.* at 1095–96. In support of his actual innocence claim, the petitioner provided affidavits from two new eyewitnesses eight years after the shooting that claimed he was not the shooter. *Id.* at 1097. The Seventh Circuit found that "[t]his sort of balance between inculpatory and exculpatory witnesses is not enough to meet the demanding *Schlup* standard for actual innocence." *Id.* at 1102.

In *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005), the petitioner alleged he had six alibi witnesses that would be willing to testify that he had been with him. *Id.* at 938. However, eye witnesses had placed the petitioner at the scene. *Id.* The Seventh Circuit found that competing evidence of this character cannot meet the demanding *Schlup* standard:

> Suppose that the six alibi witnesses had been called. That would at best have produced a draw: six eyewitnesses identify Hayes as the culprit, six others exculpate him. That cannot establish that "no reasonable factfinder would have found the applicant guilty of the underlying offense"; it is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar.

*Id.*

Here, like these cases, the evidence inculpating Petitioner was from eyewitnesses. Only two witnesses have placed Petitioner at the scene: Brown and Davis. Brown was the only individual who placed Petitioner at the scene *and* identified him as a shooter. While Brown had recanted her statements by the time of trial, the jury verdict shows that the jury did not find the recantation credible, and that they credited her previous statements instead. Davis's testimony also placed Petitioner at the scene, without inculpating or exculpating

him as the shooter. The jury also was presented with the testimony of Guzoskis that there was a shooter with dreadlocks and that Petitioner did not have dreadlocks at the time of the shooting. However, there was also evidence that the gunshots came in two waves and that there could be multiple shooters.

As part of Petitioner's original state postconviction proceedings, Davis recanted the testimony that placed Petitioner at the scene and Petitioner presented two alibi witnesses (Sutton and McAllister) that claimed he was with him. Another, Lane, testified consistent with Davis's new testimony that Petitioner was not in group in the van that was let out to go to King's apartment. Finally, Jamison testified, consistent with the trial testimony of Guzoskis, that a man with long hair was armed with a weapon. He also testified that Petitioner was not present at the altercation. Notably, the state trial court found that Jamison and Davis's testimony at the postconviction proceedings was not credible. *Daniels*, 2023 IL App (4th) 220701-U, ¶ 98.[3] The state trial court also

---

[3] This credibility determination is entitled to deference pursuant to 28 U.S.C. § 2254(e)(1). Under § 2254(e)(1), factual determinations made by the state court are presumed to be correct and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *28 U.S.C. § 2254(e)(1); see Nichols v. Wiersma*, 108 F.4th 545, 557 (7th Cir. 2024) (a "state appellate court's findings of fact and credibility determinations against the petitioner are presumed correct," absent "clear and convincing evidence that those factual findings are wrong"). While neither the Supreme Court nor the Seventh Circuit have expressly discussed whether § 2254(e)(1) applies when considering Schlup actual innocence gateway claims, circuit courts that have considered the issue agree that § 2254(e)(1) deference applies. *See, e.g., Cosey v. Lilley*, 62 F.4th 74, 82–83 (2d Cir. 2023)(collecting cases and holding that "in the context of a gateway claim of actual innocence under *Schlup*, a federal habeas court must presume that a state court's factual findings are correct, rebuttable only upon a showing of clear and convincing evidence of error."); *Reed v. Stephens*, 739 F.3d 753, 772, n.8 (5th Cir. 2014) (citing cases and also noting that "[t]he district court saw no reason not to defer to the [state court's] credibility determination, and we see none"); *Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010); *Goldblum v. Klem*, 510 F.3d 204, 221 n.13 (3d Cir. 2007). Moreover, district courts in this circuit have consistently afforded deference to such factual determinations. *See Curtis v. Warden*, No. 3:20-CV-676-JD-MGG, 2022 WL 168555, at *9 (N.D. Ind. Jan. 18, 2022) (collecting cases).

found that Sutton and McAllister's testimony would be merely conflicting with Brown's statements. *Id.* ¶78.

And now, Petitioner has submitted three additional witness affidavits. First, Doss has submitted an affidavit, consistent with Guzoskis and Jamison, that there was an individual with dreadlocks that had a gun. Second, he submitted the affidavits of two codefendants, King and Smith. Both of these individuals state (consistent with Lane, Davis, Sutton and McAllister) that he was not in the van, and (consistent with Davis) that he was not present at the shooting.

Viewing Petitioner's new eyewitness testimony combined with the trial testimony, does not meet the standard of showing that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 329. While Petitioner has introduced new eyewitness testimony, "the introduction of new eyewitness testimony does not amount to a showing of actual innocence when strong and credible testimony to the contrary remains." *Wilson*, 69 F.4th at 424. Petitioner's new evidence runs into the same issue identified in *Hayes*: Nothing about this testimony undercuts the credibility Brown's statements to law enforcement and the grand jury that the jury relied upon to find Petitioner guilty. While it creates conflicting accounts, a reasonable factfinder could still have found Petitioner guilty. Accordingly, the Court finds that Petitioner does not meet the demanding standard of the actual innocence gateway and his untimeliness cannot be excused.

## C

Petitioner has also filed a Motion to Stay and Abey (Doc. 2). In appropriate cases, the Court has discretion to stay "mixed" petitions—those with both exhausted and unexhausted claims—pending resolution of the unexhausted claims in state court. *Rhines v. Weber*, 544 U.S. 269, 278 (2005). The Court should

not grant a stay and abeyance if the petitioner has not shown good cause, if "the unexhausted claims are plainly meritless, or [if] a petitioner has engaged in abusive litigation tactics or intentional delay." *Yeoman v. Pollard*, 875 F.3d 832, 837 (7th Cir. 2017) (citing *Rhines*, 544 U.S. at 277–78). Here, Petitioner has unexhausted claims that he has now been granted leave to exhaust in state court. However, regardless of the result of those proceedings, the claims remain untimely for purposes federal habeas review. Moreover, for purposes of federal habeas review, his claims do not meet the high *Schlup* standard to proceed through the actual innocence gateway. Accordingly, the Court finds no basis to stay this petition; Petitioner's motion is denied.

### III

Should Petitioner wish to appeal this decision, he must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a claim is resolved on procedural grounds, a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim *and* about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016). Here, while the Court has not had opportunity to determine the merits of Petitioner's underlying constitutional claims, the Court does not find that reasonable jurists could disagree about whether the procedural ruling was correct.

### IV

For the reasons above, the Court GRANTS Petitioner's Motion to Supplement (Doc. 14), GRANTS Respondent's Motion to Dismiss (Doc. 9), DISMISSES Petitioner Deandre D. Daniels' Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254 (Doc. 1) as untimely, and DENIES Petitioner's Motion for Stay (Doc. 2). The Court DECLINES to issue a certificate of appealability. This case is CLOSED.

*It is so ordered.*

Entered on September 26, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE
